We move to the final cases this afternoon, Madlock v. WEC Energy Group, Inc. Mr. Retko. Good afternoon, or good late morning. May it please the court, counsel. I'm attorney Bill Retko, and I represent the appellant in this case, Rose Madlock. The main reason that we're here on appeal is that we do not believe the district court reviewed the evidence in the manner that we would request. They used the Ortiz-Werner Enterprises case and determined that the case should be reviewed on the McDonnell-Douglas standard alone. We did not argue the McDonnell-Douglas standard. We argued the evidence should be reviewed as a whole, and that everything taken together should be reviewed as a whole. And in doing that, we believe the evidence clearly shows that Ms. Madlock was discriminated against on the basis of her race. And the reason we say that is that Ms. Madlock had been employed in the billing section at WE Energies for over 20 years prior to this particular supervisor, Ms. Richa, taking over. Now, Ms. Madlock at that time had been a 36-year veteran of WE Energies, never had a disciplinary issue in regard to billing, was sought as one of the lead people in the billing area, was a go-to person. She was a customer lead specialist. She had her own group that she advised and that she answered questions for and helped them with their billing issues. In this particular matter, what happened was Ms. Richa became put into the section with little or no experience in the area. How did you pronounce that name? Pardon me? What's her name? Ms. Richa? Yeah, Richa. That's the W-R-Y-C-Z-A. Yes, that's correct. That's Richa. Right. Okay. Anyway, Ms. Richa did not find too much that she could do for the group. She was intimidated by Ms. Madlock's stature, by her knowledge, by her experience, by the fact that everyone gave her respect, and it became real apparent that Ms. Richa was not going to allow Ms. Madlock to teach her how to do the job and to answer questions regarding billing and to help people out, and she became frustrated. And what ended up happening was after about a year of this, in February of 2013, Ms. Richa, or 12, 2012, Ms. Richa decides to discipline Ms. Madlock for an event that occurred the prior May. Now, that started the ball rolling down the hill in that what ends up happening is Ms. Madlock's, eventually that discipline gets rescinded, but it doesn't get rescinded until August of 2012, six months later. And in the interim, Ms. Richa tries two other billing errors against Ms. Madlock. What eventually ends up happening, though, and I want to make this clear, is that Ms. Madlock, when she was transferred, was transferred from her position in industrial billing as a customer lead specialist to volume billing. She was placed in the center of the room between two managers and isolated from her prior group that relied on her to answer her questions. She still had the same title. She was still a manager, right? Same title, but without a group. She had no group to lead. She had the same title, was not doing the same job duties. She was actually doing the duties of a regular general biller in the volume billing. So her career at that point was stunted. She filed an internal discrimination complaint after...  It was stunted. Her career growth was stunted in that her position as a customer lead specialist was no longer something that she was doing. She was doing a general biller's job. She had no one to lead. Didn't that evolve into something where she had her own team? Yeah, she had her own team in the industrial billing area. And later on, she got her own team. Nope. In volume billing, she was given the same job title, but no team to lead. She had nothing to do in regard to her same job duties. She was, in fact, changed to the duties of a general biller. She filed an internal discrimination complaint, especially upon hearing that Ms. Richer referred to her with her new supervisor as a strong black woman. Watch her. She's a strong black woman. Who's her new supervisor? Her new supervisor was Shemekia Phillips. Also a black person. And she was a black person. And she asked... Pardon me? What did Richa... Richa? Yeah, Richa, what did she ask? Richa went over and told Ms. Phillips that Madlock was a strong black woman. Watch her. So Phillips... Say that again. This seems to be the key issue, where she uses this phrase, strong black woman. Right, that's what she says. Watch her, she's a strong black woman. And she's talking to her black supervisor. Yes, to the new supervisor. Was she saying, I don't know whether it was a concern or how to deal with a strong black woman? Was that what it was? Complaining about it? Yes, it was. See, what happened was Ms. Rich, I believe, based on the evidence, had a problem with African-American employees. She had called another woman, a strong black woman, in around 2009, had a discrimination complaint filed against her for that reason. All the women that Ms. Madlock supervised that was part of her group in industrial billing recognized Ms. Richa had a problem with Madlock and didn't feel comfortable around African-American employees. And so by using the term strong black woman... That's correct. And maybe Richa doesn't, I don't know whether she doesn't like that or what. But that's what confused me when she goes to Shameka Phillips and makes this statement. And if, as you described, that Madlock was a pretty assertive person. She was quite accomplished. And I'm only on a guess here, but she probably doesn't really much appreciate getting any criticism from Richa. And Richa may say to her name, Shameka, that, how do I deal with her? Because she really is hard for me to deal with. It would be one thing for her to say she's a strong-willed person, she's a strong person, but she was a strong black person. This is what confused me. She would talk to the black supervisor and says that. Yes. That confused me. I mean, that's normally not something you would say to a black supervisor, unless there was a genuine question of how to deal with a strong black woman. Now that, I'm only trying to hear what they have to say, but I'm really curious about that. From our perspective and the way we see the evidence is that there would have been no need for her to say strong black woman. She could have just said that she's a strong-willed person, she's a strong person, but she used the term black. And she had problems in dealing with African-American employees in the workplace, and she had prior problems in dealing with African-American employees. And moreover, the only person she ever wrote up for a billing problem was my client. And this was on a system in which there were no standards as to when to write someone up as opposed to verbally counsel them. My client was clearly targeted by Ms. Richa. My client had a target on her back because things that other people were not given discipline for, my client was disciplined over. And that was why the internal complaint was filed for retaliation, and that's when the retaliation occurred because after the internal complaint was filed, further disciplinary actions then began. Well, Medlock was, maybe objectively, she was having some problems. Is that correct or not? Our position is she was not having problems. About overbilling and, you know, a lot of money and all that sort of thing? She may have had her hand in some of that, but the thing of it is other billers were also involved in those billing situations, and they didn't get disciplined, they didn't get counseled, nothing happened with them, and they were involved in the same billing process making the same errors. And it was because the equipment in the field was incorrect, and it was things of that nature that caused particular errors to occur. If you don't mind, I'd like to reserve the rest of my time for rebuttal. Thank you, Counsel. Thank you. May it please the Court. Good afternoon. Judge Roldner, Counsel. I want to address some of the issues Counsel raised and some of the issues in the briefing and also, of course, answer any questions and address any concerns. Could I start you with a question, please? Yes, Your Honor. If Ms. Rich had told Ms. Phillips that she was intimidated by Ms. Matlock as a strong black woman, why wouldn't that permit a fact finder to conclude that Ms. Matlock's race played a role in the decision to transfer her to volume billing? Nominally, Ms. Tiller made the transfer decision, but surely she did not make that decision without input by Ms. Rich, did she? And she did not say a strong woman. Rather, she said a strong black woman. That worries me greatly. Judge, there's a lot there. So, first, you indicated that Ms. Rich had told Ms. Phillips that Ms. Matlock, she was intimidated by Ms. Matlock. That's not in the record. That's not the evidence. What she said to her. I didn't. What I said, if you were listening, was if Ms. Rich told. She did not. So that's not in the evidence. What she said, according to the evidence, is she characterized Ms. Matlock as a strong black woman in that conversation. And then there was a alleged other conversation with a co-worker where she asked, how do you deal with strong black women? So that's the evidence in the record. The intimidation piece is something that Ms. Matlock said, that she believed that she intimidated Ms. Rich. But that's not anything Ms. Rich said to anybody. So, with respect to the question of why is it problematic to refer to her as a strong black woman, I would submit, Your Honor, that that statement, even assuming it was made, is not offensive. There's nothing wrong with making reference to someone's race. That's not what Section 1981 seeks to prohibit. What Section 1981 says is you can't take action based upon it. It doesn't require people to put blinders on and ignore the obvious differences between people. And she certainly didn't convey any sort of hatred or dislike for anybody on the basis of their race. So, in fact, Ms. Matlock characterizes herself as a strong-willed black woman. So it's simply not evidence. Where did she do that? I thought I remembered seeing that, where she says, expresses that she is, you know. Yeah, she admitted that in her deposition, Your Honor. Surely you don't expect her not to admit that she's black. Correct. But she certainly admitted that she was strong-willed. And that's not a negative attribute in any event, saying that someone is strong-willed. I'd be great to attribute, actually. Pardon? Strong-willed is not a bad attribute. And I would agree with you, Judge. And neither is being characterized as a strong black woman. But even assuming you disagree with. When the characterization, their history, how they are saying it, why they are saying it, something can be very negative. What I would say here is, if anything, the fact that, first of all, if the intent, if she was trying to make an offensive statement about race, you certainly wouldn't be saying it to an African-American supervisor. That wouldn't make any sense. Why not? There are people of the same race, the same religion, who may not like other people of the same race, same religion. You cannot paint such a broad brush. Well, Judge, to the extent you disagree with me on that issue, you don't even have to reach that issue. Because the first problem is that we don't even have a materially adverse employment action. And it's not actionable. She was transferred. It was a lateral transfer. She didn't lose any money. No layoff. No suspension. So this move to the volume billing group was not something that's even actionable. The civil rights laws aren't designed to deal with something, frankly, like that, that doesn't result in any injury to a plaintiff. Does this company have a The injury was to her future hopes. And there was a great deal of discussion and inquiry into whether the transfer was humiliating to her. Evidently, her coworker thought that it was. And right there, you have a fact question as to whether this was an adverse employment action under our cases. Well, I would respectfully refer the court to a decision in the Place v. Abbott Labs case. Where the person was, first of all, and Judge Kenney, I mean to correct something, she was not a manager. Ms. Matlock has never been a manager or supervisor. She's a union employee. What was her position in the union? She was a union steward. And so she was a lead customer service specialist. She's never been in a supervisory position. Well, a union steward has some authority, doesn't it? Isn't that some representative or something like that? I don't know about that structure. I'm only curious because that's in a different venue. But at the same time, it's something more than just a union member. Right. So she was a union steward. She could help other employees who had grievances in that role. But that role isn't really an issue here. No. And there is no evidence that she was at all had her career affected. Does the company have an age termination? In other words, retire at 65? Is there any requirement of any retirement age? I don't think there's a requirement, but I do think it is possible to get certain benefits once you reach a certain age. Like I'm saying, so she's not up against you have to leave. When you're 65, you have to leave the company. Correct. And the other thing I'd like to emphasize, this wasn't a disciplinary decision. This was a risk mitigation decision. She was making errors, and that's not contested at all. Well, that's the key. This is sort of a change as time went on, and she was making errors. And somebody came up with $100,000. Yeah. It was actually more than $100,000 that she cost the company. And, again, that's not disputed in the record. Counsel simply said. What is disputed in the record is your position that there were absolutely no errors on that list that they made up about her, you know, sort of after the fact. If there were errors, wouldn't that permit an inference that the list was compiled for a nefarious purpose? Absolutely not, Your Honor. First of all, that list was prepared, according to even the plaintiff, to assist in the grievance relating to a grievance that she had filed. It wasn't prepared. The list was compiled shortly after Ms. Risa learned about Ms. Madlock's complaint about her. And I would like to know what the record shows about a similar list being created for any other employee. Is she the only employee that they created such a list for? No. In fact, the evidence is that as Ms. Tiller came into the department, she, in fact, directed that the supervisors in the department actually create a list for the other employees, so she could get a sense of what kind of coaching, counseling they had received in terms of how to do the proper billing. So with respect to the race claim, that claim falls out because there's no material adverse action. And likewise, the retaliation fails on that basis. The written warning that is, you know, she bases the retaliation claim on two things, a written warning and this list. Judge Mannion, you have an opinion in the Kirsten case that's directly on point. There, there were two written warnings that the employee had been subject to, and it was found that that was just insufficient to base a civil rights claim on. And the list, of course, there's no evidence in the record that the list resulted in any sort of harm. And in fact, again, Ms. Matlock admits that the list was made for purposes of assisting the company in upholding a personnel decision in a grievance process. It wasn't in response. There's no evidence that it was in response to the fact that she had made an internal complaint. That whole process had started before she ever made an internal complaint. And the idea that she would be subject to a written warning is hardly surprising when you look at the massive number of errors that she had committed that resulted in a company losing a lot of money. It was the next step in the process. So it's hardly coming out of left field. So I see that my time is up. I'm happy to address any other questions the court may have. Do you happen to know how old she is? I don't, Your Honor. Thank you. That's all. Thank you. How long has she been an employee there? I think in excess of 30 years. So she's been a long-term. Almost 40 years. Yes. She's been a long-term employee. My question is how old was she at the time all this happened and her anticipation of promotion? Thank you. How much time? Less than a minute. Thank you. Judge, just a couple things in rebuttal here. The statement Judge Rovner has is exactly right. The statement strong black woman may not be offensive on the surface, but it clearly explains Ms. Rich's mindset about Ms. Madlock and other African-Americans that she had problems with, she was intimidated by. She told Ms. Madlock the week before the transfer occurred, I'm intimidated by your stature. I cannot be an effective manager in this group without you being here. Now, in regard to the customer lead specialist, she had an IOT group she was assigned that she supervised to the extent that they came to her for questions on billing issues. That was taken away from her. She didn't have a group when she was transferred. I wanted to make those clear points. Okay, and then she never did get another position where she had a team? Not while she was in the volume billing group. I'm sorry? No. When she was transferred, she never did get another IOT group assigned to her. She sat in the middle of the room between two managers, with management ordering her prior group not to come to her to talk to her anymore. Thank you. I appreciate it. Thank you, counsel. Thanks to both counsel. The case will be taken under advisement, and the court will stand in recess.